# 2006 DTA 117

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE CAGUAS**
**PANEL XI**

EL PUEBLO DE PUERTO RICO
Apelado

v.

ANTONIO FIGUEROA ROQUE
Apelante

Núm. KLAN-05-00289

San Juan, Puerto Rico, a 25 de septiembre de 2006

Panel integrado por su Presidenta, la Juez Pesante Martínez,
y los Jueces Feliciano Acevedo y Salas Soler

Salas Soler, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El recurso instado en el caso de epígrafe interesa la revocación de una sentencia emitida el 11 de febrero de 2005, por el Tribunal de Primera Instancia, Sala Superior de Caguas, mediante la cual se halló culpable a Antonio Figueroa Roque por infracción al Artículo 87 del Antiguo Código Penal del 1974.

Inconforme con el dictamen del Tribunal de Instancia acude ante este foro el convicto, Sr. Antonio Figueroa Roque.

Por las razones esbozadas a continuación, confirmamos la sentencia emitida. Exponemos.

### I

La Sra. Magdari Casillas Márquez y el Sr. Ariel Barreiro Díaz compartían una residencia en la carretera Núm. 172 en Cidra. Según consta de autos, la Carretera Núm. 172 esta dividida en dos direcciones, una hacia Caguas y la otra hacia Cidra. En dirección hacia Caguas, la carretera sólo consta de un carril y en dirección hacia Cidra consta de dos carriles. La residencia está ubicada al lado de los carriles con dirección hacia Cidra.

La residencia consiste en una casa terrera de dos plantas, en la cual la marquesina queda ubicada en la primera planta. Dentro de la marquesina se guardaba un vehículo de motor, marca Hyundai del año 1997, cuatro puertas, de color blanco.

El 21 de diciembre del 2001, ambos se disponían a salir de la residencia, por lo que el Sr. Ariel Barreiro se montó en el vehículo de motor para sacarlo del área de la marquesina. Sin embargo, el Sr. Barreiro luego que se montó en el vehículo, le indicó a su compañera, la Sra. Magdari Casillas, que sacara el mismo ella. Así las cosas, la Sra. Casillas procedió a montarse en el vehículo y a sacarlo de la marquesina en reversa. Mientras ésta sacaba el vehículo, el Sr. Barreiro se encontraba cerrando los portones de la marquesina, entre los cuales se encontraba un portón peatonal.

Según consta de las transcripciones del caso de autos, la Sra. Casillas estacionó el vehículo en dirección hacia Caguas, bien pegado a la verja de la casa. (Véase, Transcripción de Vista, 10 de agosto de 2004, a las págs. 83-85). De esta manera, según el testimonio de la Sra. Casillas, el carro quedó ubicado fuera del área de rodaje y de tal forma que podía tocar la verja de la casa con sus manos. (Véase, Transcripción de Vista, 10 de agosto de 2004, a la pág. 84). La Sra. Casillas colocó el vehículo en *parking* y apagó el mismo en espera de que el Sr. Barreiro abordara el automóvil.

Mientras esperaba por el Sr. Barreiro, la Sra. Casillas se percató de dos vehículos que venían subiendo en dirección hacia Cidra. Un vehículo era de color claro y otro color oscuro. El vehículo de color oscuro se

encontraba en el carril de adentro, el cual queda a la derecha, y el claro se encontraba transitando por el carril de afuera, el cual queda a la izquierda. Así las cosas, la Sra. Casillas observó cuando el vehículo de color claro aceleró repentinamente haciéndole un *"corte de pastelillo"* al vehículo de color oscuro. Según surge de su propio testimonio, los vehículos se encontraban como a ciento veinte pies (120) pies de distancia de donde la Sra. Casillas estaba estacionada. (Véase, Transcripción de Vista, 10 de agosto de 2004, a la pág.101). Acto seguido, la Sra. Casillas vio como el vehículo de color claro continuó acercándose a donde ella estaba estacionada, razón por la cual se voltió para mirar dónde se encontraba su compañero, Ariel Barreiro, el cual en ese momento estaba dándole la vuelta al vehículo por la parte de atrás para montarse en el área del pasajero. Luego de esto, la Sra. Casillas sintió un impacto en la parte de arriba de su auto. Posteriormente, despertó en el Hospital Juan Bautista.

Como causa del accidente, el Sr. Barreiro fue arrollado por el vehículo de color claro, el cual fue identificado como una guagua gris Suzuki, marca Grand Vitara del año 1999, propiedad del apelante, Sr. Antonio Figueroa Roque. Conforme surge de autos, el Sr. Barreiro falleció al instante debido a un severo trauma corporal.

Como consecuencia de los sucesos acaecidos, el apelante fue acusado por violación al Artículo 87 del Antiguo Código Penal, 33 L.P.R.A. sec. 4006 (2001). Luego de celebrado el juicio por Tribunal de Derecho, el apelante fue hallado culpable del delito imputado, por lo que fue condenado a cuatro (4) años de pena de reclusión. No obstante, se le concedió los beneficios de la sentencia suspendida.

El apelante acudió ante este foro por entender que la sentencia emitida por el Tribunal de Primera Instancia no era conforme a derecho. Presentó ante este foro apelativo siete (7) señalamientos de errores, que en síntesis giran en torno a la apreciación y valorización de la prueba que tuvo el Tribunal de Instancia ante su consideración. En específico, alega que el Tribunal de Instancia incidió en no absolver al imputado cuando la prueba presentada por el Ministerio Público fue alegadamente vaga y contradictoria. A su vez, el apelante sostiene que el hecho de que el juez no resolviera el caso el mismo día que fuera sometido, tardándose siete días en resolver, equivale a que existía duda razonable en la decisión del juez, por lo cual debió haberlo absuelto.

A continuación realizamos la exposición de la prueba presentada. Exponemos.

## II

El Ministerio Público presentó, como parte de su prueba, los testimonios del agente Arístides Vázquez Díaz, el Ingeniero Carlos E. Reoyo y la Dra. Edna González. Durante el testimonio del agente Arístides Vázquez, éste testificó que había investigado el accidente ocurrido. Manifestó que lleva laborando en la División de Tránsito (16) años y que actualmente, en su división, es el agente con más experiencia investigando casos de accidentes de carácter grave.

El agente indicó que al llegar a la escena del accidente, encontró un cuerpo sin signos vitales tirado a la orilla de un portón de una residencia. A la vez, observó dos vehículos impactados los cuales eran, una Suzuki Grand Vitara y un Hyundai Accent color blanco. El vehículo Suzuki Grand Vitara lo encontró volcado, con las gomas hacia arriba. El agente testificó que el Hyundai tenía la parte superior hacia abajo o hundida, y que había observado unas marcas de llantas en el pavimento. Indicó, además, que observó un árbol cuya corteza se veía impactada, y que a su vez observó que los aros del vehículo de la Grand Vitara tenían incrustados corteza de un árbol. Según las observaciones del agente, el pavimento estaba seco y era un día claro. Finalmente, el agente testificó que al llegar a la escena del accidente observó también que el vehículo Hyundai estaba en neutro con el *"switch"* apagado y que en el lado del conductor se encontraba la Sra. Casillas la cual estaba aturdida y llorando.

Como parte de la investigación, el agente preparó un croquis con las medidas que tomó el día del accidente. Durante su testimonio, el agente explicó en qué consistía el croquis preparado. Así pues, indicó que en el mismo se podían observar las marcas de llanta en el pavimento, la cuales tenían (30) treinta pies de distancia. Asimismo, señaló que desde el área del impacto inicial, el cual fue con un árbol, hasta donde cayó la Grand Vitara con las

gomas hacia arriba, había una distancia de (72) setenta y dos pies. (Véase, Transcripción de Vista, 1 de septiembre de 2004, a las págs. 41-42). Continuó explicando, que según su investigación el accidente ocurre al ir la Gran Vitara subiendo hacia Cidra por el carril izquierdo cuando le corta a un vehículo que venía a su vez subiendo hacia Cidra por el carril derecho. Durante su testimonio, y a preguntas del Ministerio Fiscal, el agente testificó:

*"R. Este. Hay otro subiendo por este. El vehículo es, el Suzuki Grand Vitara viene por aquí, corta, pierde el control y se mete al área verde y es cuando yo digo que hay marcas de llantas de treinta pies, impacta al árbol de flamboyán, cuando impacta el árbol, el vehículo viene tan rápido que le sirve de catapun...(Init.)... y se impulsa.*

*P. ¿Le sirve de qué?*

*R. De catapún...(Inint.).", se eleva en el aire.*

*P. Anjá.*

*R. Al elevarse le cayó en la parte superior del vehículo, encima del vehículo Hyundai Accent, cuando cae sobre el vehículo por ahí impacta al peatón, al señor occiso, Ariel Barreiro Díaz, el cual venía caminando para el lugar del vehículo Hyundai Accent por la parte derecha, por el área del pasajero, lo impacta, la persona pues, fallece en el acto y el vehículo sigue dando vuelta...".*

(Véase, Transcripción de Vista, 1 de septiembre de 2004, a las págs. 45-46).

Durante su testimonio, el agente continuó explicando que según los hallazgos de su investigación, una vez la Suzuki Grand Vitara impacta al Hyundai, éste se mueve hacia al frente impactando el árbol de flamboyán. Finalmente, el agente expresó que en base a la magnitud del accidente, la Grand Vitara tenía que haber transcurrido a una velocidad de 70 millas por hora. Según su testimonio, la velocidad límite de la carretera es de 45 millas por hora. Señaló, también, que para su determinación de velocidad tomo en consideración las llantas de la Grand Vitara, las cuales según sus observaciones eran prácticamente nuevas, que era un día seco y que murió una persona por el impacto del accidente.

El Ministerio Fiscal presentó también como testigo al ingeniero Carlos Reoyo, el cual fue contratado por la Fiscalía para realizar un estudio de reconstrucción del accidente. Según su testimonio, éste utilizó todos los documentos que le fueron suministrados, la documentación por él recopilada, así como las ecuaciones correspondientes para determinar la velocidad en este tipo de accidentes. El perito indicó que realizó dos análisis, uno a base de la energía disipada en la deformación de los vehículos y otro basado en la velocidad que era necesaria para pasarle a un vehículo que transcurría a la velocidad permitida en el lugar de los hechos. (Véase, Transcripción de Vista, 23 septiembre de 2004, a las págs. 57-58).

En el análisis para determinar velocidad, el perito testificó que utilizó dos velocidades distintas. En un primer análisis, basado solamente en la energía disipada en las deformaciones de los automóviles, obtuvo que la Grand Vitara tuvo que haber transitado a una velocidad mínima de 50.4 millas por hora. No obstante, según el propio testimonio del perito, en este análisis sólo se tomó en consideración los golpes principales. (Véase, Transcripción de Vista, 23 de septiembre del 2004, a la pág. 58, 91; véase además, Transcripción de Vista, 6 de octubre del 2004 a la pág. 89). En los análisis subsiguientes, el perito testificó que a base de las ecuaciones de velocidad y aceleración obtuvo dos velocidades distintas para las cuales la Grand Vitara hubiese podido transcurrir. Indicó que tomando en consideración que el límite de la carretera en donde ocurrió el accidente era 45 millas por hora, y asumiendo que el vehículo que fue rebasado transcurría a dicha velocidad, la Grand Vitara habría tenido que llegar a las 70 millas por hora para pasarle y cortarle al frente. (Véase, Transcripción de Vista, 23 de septiembre del 2004, a las págs. 71-72). Por otro lado, el perito también hizo otro análisis en el cual le asignó al vehículo que

es rebasado la velocidad de 35 millas por hora. En este supuesto, la Grand Vitara hubiese tenido que alcanzar la velocidad de 60 millas por hora para pasarle y cortarle al frente al otro vehículo.

El perito señaló que a base de sus hallazgos, la Grand Vitara transcurría a una velocidad mayor de cincuenta millas por hora. (Véase, Transcripción de Vista, 6 de octubre del 2004, a las págs. 88-90; véase además, Transcripción de Vista, 23 de septiembre del 2004, a la pág. 58). Finalmente, según su testimonio, éste utilizó las ecuaciones que se encuentran en el libro del tratadista Limpert, el cual es reconocido por tratar con los temas relacionados a los accidentes automovilísticos. (Véase, Transcripción de Vista, 23 de septiembre del 2004, a la pág. 61).

Del resumen que antecede de los testimonios reseñados, surge con claridad que no existe ninguna discrepancia entre los hallazgos del agente que investigó la escena del accidente, y los hallazgos del perito del Ministerio Público. Como mencionamos anteriormente, el agente había indicado que según sus investigaciones, y la experiencia que tenía investigando accidentes, el apelante tuvo que haber transitado a una velocidad de 70 millas por hora.

En otro aspecto, durante el testimonio del perito, éste señaló inclusive que no pudo medir todas las energías que fueron absorbidas en el curso del accidente. Es por esa razón que indicó que la velocidad de 50.14 millas por hora es un valor mínimo, conservador, que no tomó en cuenta todos aquellos otros elementos que no se pudieron calcular. (Véase, Transcripción de Vista, 23 de septiembre de 2004, a la pág. 91). En específico, el perito testificó que al vehículo impactar el árbol, éste impacto absorbió energía que no pudo ser contabilizada. (Véase, Transcripción de Vista, 23 de septiembre de 2004, a la pág. 89). De igual manera, indicó que tampoco pudo contabilizar la energía que absorbió la Grand Vitara al dar volteretas antes de volcarse. (Véase, Transcripción de Vista, 23 de septiembre de 2004, a la pág. 92).

Sin embargo, el apelante arguye que el testimonio del perito carece de validez, debido a que no utilizó unos informes preparados por el Departamento de Transporte, en los cuales alegadamente se verifican algunos aspectos mecánicos de los automóviles involucrados en un accidente. Asimismo, alega que el Estado no pasó prueba tan siquiera de la existencia o no existencia de dicho informe. Según sus contenciones, el apelado argumenta que debido a que la causa del accidente pudo ser producto de una falla mecánica en el cable de aceleración, el informe debió haber sido evaluado por el perito de fiscalía. Sin embargo, a preguntas específicas de la fiscal, el perito contestó que los referidos informes no hubiesen tenido impacto alguno en su conclusión. (Véase, Transcripción de Vista, 6 de octubre de 2004, a la pág. 88). Señaló que los informes a los que hacía alusión la defensa son informes que prepara el Departamento de Transporte en los cuales lo único que hacían era examinar cosas a simple vista. (Véase, Transcripción de Vista, 6 de octubre de 2004, a las págs. 91-92). En específico, el perito indicó que lo que se hacía en ese informe era verificar las condiciones de las gomas, frenos o cosas que saltaran a la vista. Puntualizó que Transporte no entra a verificar desperfectos que tengan que ver con desarmar un motor u otras cosas más específicas. (Véase, Transcripción de Vista, 6 de octubre de 2004, a la pág. 91). De esta manera, el perito testificó que el fallo alegado por la defensa no era uno que se hubiese reflejado en el informe del Departamento de Transporte. Indicó que lo que entrega el Departamento es un informe de dos páginas y que el informe pericial como tal lo realizaba él. (Véase, Transcripción de Vista, 6 de octubre de 2004 a las págs. 97-98).

No obstante, parte de la teoría del apelante, es que éste debió ser absuelto, ya que el accidente fue producto de una alegada falla mecánica. El apelante sostiene que su vehículo sufría de un desperfecto que la compañía de la Suzuki estaba tratando de corregir en los modelos Grand Vitara, en específico los de los años año 1999 al 2003. El vehículo del apelante era del año 1999.

Para apoyar la contención antes aludida, el apelante presentó como testigo al Sr. José Morales Rodríguez, gerente del departamento de Suzuki Caribe, y al Sr. Salvador López Cardec, perito de la defensa.

El Sr. José Morales testificó que hubo una campaña de seguridad en cuanto a los vehículos Grand Vitara y Grand Vitara XL7 de los años 1999 al 2003. Dicha campaña fue con el propósito de alertar y corregir un desperfecto que estos modelos posiblemente tenían. El desperfecto era en relación al cable de aceleración, el cual si padecía del mismo, podía ocasionar que el vehículo se quedara acelerado. Indicó que lo que la campaña decía era que se podía tener dificultad en controlar la velocidad del vehículo. Testificó que el apelante fue notificado de dicha condición por medio de una carta cursada, pero que de sus récords no aparecía que éste hubiese llevado su vehículo a inspeccionar. (Véase, Exposición Narrativa de la Prueba, pág. 56).

Por otra parte, la defensa presentó el testimonio del Sr. Salvador López Cardec, el cual testificó como perito para rendir su análisis en torno a la existencia de algún desperfecto en el vehículo del apelante, el cual hubiese podido ocasionar el accidente. Así pues, el Sr. Salvador López testificó que examinó personalmente el vehículo del apelante y que encontró problemas con el cable de aceleración. En síntesis, testificó que había verificado el referido automóvil y que al examinar el cable de aceleración encontró que el mismo estaba fatigado, lo cual quería decir que el vehículo eventualmente iba a mantener la aceleración que llevara en un momento dado. (Véase, Transcripción de Vista, 23 de noviembre de 2004, a la pág. 43). El perito indicó que él mismo había removido el cable y que lo tenía en su poder.

La defensa solicitó ofrecer en evidencia el cable de aceleración, a lo que el Tribunal de Instancia no accedió por entender que no se había cumplido con establecer la cadena de custodia. **El perito había inspeccionado el vehículo dos años y medios después del accidente.**

### III

Un principio básico de nuestro acervo jurídico es que la cadena de custodia sirve el propósito de evitar error en la identificación del objeto, y demostrar que la evidencia no ha sufrido cambios sustanciales. *Pueblo v. Bianchi Álvarez,* 117 D.P.R.484, 488 (1986). A estos efectos, lo importante es que sea razonable concluir que la evidencia ha sido adecuadamente custodiada y salvaguardada, por el cual no haya sufrido cambios sustanciales desde que fue ocupada. *Pueblo v. Bianchi, supra,* pág. 492. En *Pueblo v. Carrasquillo,* nuestro más alto foro expresó:

*"...lo importante es que se pueda razonablemente concluir que la evidencia ha sido adecuadamente custodiada y salvaguardada, y que convencido el tribunal de que no ha habido anormalidad que afecte la adecuada custodia de la evidencia, debe admitir la misma...".* (Citas Omitidas). *Pueblo v. Carrasquillo,* 123 D. P.R. 690, 698 (1989).

En el caso específico ante nuestra consideración, el Tribunal de Instancia entendió que la defensa no había cumplido con las garantías mínimas para custodiar el referido cable. Precisa destacar que el vehículo se encontraba en un *junker* en el cual se le habían removido la mayoría de las piezas, entre ellas el motor. Según surge del propio testimonio del perito, cuando inspeccionó el vehículo dos años y medio después no tenía bumper, ni cristales, ni motor, ni gomas. Indicó que para sacar el motor se tiene que mover el cable de aceleración. (Véase, Exposición Narrativa de la Prueba, pág. 59). A preguntas específicas de la fiscal, el perito expresó que no podía indicar si el vehículo se encontraba en las mismas condiciones que para la época del accidente. (Véase, Transcripción de Vista, 22 de noviembre de 2004, a la pág. 75).

A raíz de lo anterior, coincidimos con el Tribunal de Instancia en su determinación de no aceptar en evidencia el cable de aceleración. Resulta forzoso concluir que la defensa no pudo demostrarle al Tribunal que el referido cable no había sufrido alteraciones sustanciales desde el día de los hechos hasta el momento en que fue inspeccionado. Más aún, en el caso de autos era esencial que se estableciera una cadena de custodia, toda vez que el cable de aceleración se pretendía ofrecer en evidencia con el propósito de establecer que la causa del accidente fue producto del alegado desperfecto en éste. La cadena de custodia toma mayor importancia cuando dicho cable fue inspeccionado dos años y medios después del accidente y el automóvil se encontraba en un *junker* sin gran parte de sus piezas.

Por otra parte, aun y cuando el cable no fue admitido en evidencia, el Tribunal de Instancia permitió que el perito testificara en cuanto a sus hallazgos y su opinión pericial. De esta manera, aunque la defensa no pudo entrar el cable de aceleración en evidencia, pudo presentar como testimonio la opinión pericial de su perito. Dicho testimonio recibió la credibilidad que el juzgador de los hechos estimó adecuada otorgarle.

## IV

El apelante arguye en su escrito de apelación que la acusación no imputaba delito y que no se logró probar los elementos del mismo.

En lo que respecta a la acusación, el argumento del apelante carece de mérito. La acusación lee como sigue:

*"El fiscal formula acusación contra Antonio Figueroa Roque por el delito de Infr. al Art. 87 Código Penal, porque allá, en o para el día 21 de diciembre de 2001 y en Caguas, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala Superior de Caguas, ilegal, voluntaria, maliciosa y criminalmente, mientras conducía el vehículo de motor marca Suzuki, Grand Vitara, color gris, año 1999, tablilla DLX-778, lo hizo con tal descuido, imprudencia crasa o temeraria, demostrando un absoluto menosprecio de la seguridad de los demás, consciente en que conducía su vehículo a una velocidad mayor de lo permitido en ley, lo que no le permitió ejercer el debido dominio y control del volante, lo que dio lugar a que el vehículo en cuestión perdiera el control saliéndose de la vía de rodaje yendo a impactar un árbol en la orilla de la carretera a la vez que continu[ó] la marcha e impact[ó] con la parte frontal la parte posterior lateral derecha del auto marca Hyundai Accent, color blanco, tablilla CXP-837, año 1997, el cual estaba estacionado fuera de la vía de rodaje, el cual era ocupado el volante por la Sra. Magdari Casillas Marqués. El auto Suzuki al impactar el auto Hyundai, el mismo vir[ó] y dio varias vueltas impactando [é]ste al peatón el SR. ARIEL BARREIRO DIAZ, quien se encontraba caminando por la parte posterior del auto marca Hyundai para abordar el mismo. Por consecuencia del impacto falleció en el acto."*

(Véase, Acusación, en autos originales del Tribunal de Primera Instancia, el cual examinamos con detenimiento).

La Regla 35(c) de Procedimiento Criminal dispone en parte lo siguiente:

*"La acusación y la denuncia deberán contener:*

*(C)Una exposición de los hechos esenciales constitutivos del delito, redactada en lenguaje sencillo, claro y conciso, y de tal modo que pueda entenderla cualquier persona de inteligencia común."* (Citas Omitidas)

Regla 35(c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

El pliego de acusación tiene el propósito fundamental de informar al acusado del delito por el cual se le está procesando. *Pueblo v. Nervaez*, 122 D.P.R. 80, 86 (1988). El curso jurisprudencial en cuanto al mismo ha establecido que una acusación no tiene que calificar el delito con arreglo al Código Penal. *Pueblo v. Santiago Cedeño*, 106 D.P.R. 663, 666 (1978). De esta manera, lo fundamental es que la acusación consigne los elementos del delito por el cual se está acusando, de manera tal que constituya una adecuada notificación de la naturaleza y de los cargos por los cuales se acusa. *Pueblo v. Santiago Cedeño, supra*.

En el caso de autos, la acusación presentada es suficiente en derecho. El acusado quedó debidamente notificado del cargo y de los hechos por los cuales estaba siendo procesado. El Art. 87 del Antiguo Código Penal dispone que toda persona que en el transcurso de conducir un vehículo de motor, de manera temeraria o con absoluto menosprecio de la seguridad de los demás, le ocasione la muerte a otra, se le impondrá pena de reclusión por un término fijo de seis años. 33 L.P.R.A. sec. 4006 (2001). La velocidad excesiva es indicio de imprudencia crasa según establecido por nuestro Tribunal Supremo. *Pueblo v. Andaluz Méndez*, 143 D.P.R. 656 (1997).

En el pliego acusatorio se especificó que el apelante estaba conduciendo su vehículo de manera temeraria y que por su descuido le ocasionó la muerte a una persona. Se realizó a su vez una breve narración de los hechos y de las personas involucradas en el accidente. Así pues, la acusación estuvo conforme a nuestros parámetros jurisprudenciales.

Por otro lado, como mencionáramos anteriormente, el apelante también sostiene que el Ministerio Fiscal no probó los elementos del delito imputado. Arguye que no se pasó prueba de cuál era la velocidad del lugar del accidente, así como tampoco de la velocidad a la cual discurría el apelante. A su vez, arguye que entre otras cosas el Ministerio tampoco pasó prueba de que algún peatón falleciera en el sitio del accidente. Los señalamientos antes aludidos también carecen de mérito alguno.

Conforme la prueba presentada por el Ministerio Fiscal, éste pudo probar que el apelante transcurría a una velocidad mayor que la permitida, y que por tal razón al cortarle al otro vehículo perdió el control, ocasionando el accidente por el cual fue procesado. Como ya hemos expuesto, tanto el perito del Ministerio Público, como el agente que investigó el accidente, indicaron que el apelante tuvo que haber transitado a una velocidad de alrededor 70 millas por hora. En el testimonio del perito, éste explicó paso por paso como reconstruyó el accidente y las ecuaciones que utilizó para el mismo, tomando en consideración los daños ocasionados. Ambos testigos testificaron que la velocidad límite en la carretera en donde sucedió el accidente era de 45 millas por hora. (Véase, Transcripción de Vista, 23 de septiembre del 2004, a las págs. 71-72; véase además, Transcripción de Vista, 1 de septiembre del 2004, a la pág. 57).

Por otro lado, y en cuanto al planteamiento del hecho de que no se pasó prueba en cuanto a la muerte de un peatón, no podemos contemplar lo absurdo. Resulta obvio que el occiso Ariel Barreiro murió como consecuencia del accidente. Del testimonio de la Sra. Magdari Casillas se desprende que la última vez que vio al occiso con vida, fue cuando éste estaba caminando por la parte posterior del vehículo Hyundai en vías de abordar el mismo. (Véase, Transcripción de Vista, 10 de agosto de 2004, a las págs. 103-104; véase además, Exposición Narrativa de la Prueba, pág.7). Más aún, durante su testimonio y a preguntas específicas del Ministerio Fiscal, ésta declaró que vio la persona que conducía el vehículo que la impactó, y en corte abierta identificó al apelante. (Véase, Transcripción de Vista, 10 de agosto de 2004, a la pág. 105).

Por otra parte, durante el testimonio de la Dra. Edda Rodríguez Morales, testigo del Ministerio Fiscal y patóloga forense que practicó la autopsia en el cuerpo del occiso, ésta testificó que el occiso falleció debido a un severo trauma corporal y que de sus hallazgos podía concluir que los traumas sufridos por el occiso eran compatibles con los de un peatón arrollado. (Véase, Transcripción de Vista, 22 de octubre de 2004, a las págs. 25,34). Señaló que los traumas corporales de los pasajeros son diferentes a los de un conductor y que asimismo, los peatones sufren de traumas diferentes en el transcurso de un accidente automovilístico. (Véase, Transcripción de Vista, 22 de octubre de 2004, a las págs. 34-35). Finalmente y a preguntas del juez, la testigo indicó que los severos traumas corporales sufridos por el occiso fueron causados por el impacto con un objeto contundente. (Véase, Transcripción de Vista, 22 de octubre de 2004, a la pág. 47). Así pues, y en vista de los testimonios presentados por el Ministerio Fiscal, queda incontrovertido el hecho de que el Sr. Ariel Barreiro falleció como producto de los golpes recibidos al ser arrollado por el apelante.

## V

Finalmente, el apelante arguye que debió ser absuelto, toda vez que existió duda razonable y que el hecho de que el juez tardara siete días en emitir su fallo, luego de haberse sometido el caso, es indicativo de lo anterior.

Sabido es, que en un proceso criminal el Estado tiene que probar la culpabilidad del acusado más allá de toda duda razonable. Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. En los casos en que el Estado no haya podido probar la culpabilidad del acusado más allá de toda duda razonable, el juez deberá absolver inmediatamente al acusado. 34 L.P.R.A, *supra*. Como colorario de lo anterior, nuestra jurisprudencia ha

establecido que la prueba necesaria para establecer la culpabilidad más allá de duda razonable es aquella mediante la cual se establece la culpabilidad del acusado con aquella certeza moral que convenza, dirija la inteligencia y satisfaga la razón del juzgador, de manera tal que produzca convicción o certeza moral en un ánimo no prejuiciado. *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 652 (1986). En *Pueblo v. Irizarri*, **2002 J.T.S. 68**; 156 D.P. R.\_, nuestro más alto foro expresó:

"...*duda razonable no es una duda especulativa o imaginaria como tampoco lo es cualquier duda posible. "Duda razonable" es aquella duda fundada que surge como producto del raciocinio de todos los elementos de juicio envueltos en el caso. Pueblo v. Cruz Granados, ante. Para que se justifique la absolución de un acusado, la duda razonable debe ser el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación. En resumidas cuentas, "duda razonable" no es otra cosa que la insatisfacción de la conciencia del juzgador con la prueba presentada.*" (Citas Omitidas).

La determinación que ha hecho un juzgador a nivel de Instancia a los efectos de que la culpabilidad de un acusado ha sido probada más allá de toda duda razonable es revisable a nivel apelativo como cuestión de derecho. *Pueblo v. Serrano Nieves*, 93 D.P.R. 56, 60 (1966); *Pueblo v. Caban Torres*, 117 D.P.R. 645, 653 (1986). No obstante, reiteradamente se ha establecido que "*la determinación de culpabilidad que hace un juzgador de los hechos a nivel de instancia es merecedora de gran deferencia por parte del tribunal apelativo.*" *Pueblo v. Cabán Torres, supra*, pág. 653-54. Ello, debido a que es el juzgador de lo hechos quien está en mejor posición para apreciar y aquilatar la prueba, ya que fue el que oyó y vio declarar a los testigos. *Pueblo v. Cabán Torres, supra*, a la pág. 654. Así pues, en ausencia de error manifiesto, pasión, prejuicio o parcialidad, un tribunal apelativo no debe intervenir con las determinaciones de hechos y la adjudicación de credibilidad que realizó el juzgador de los hechos. *Colón Muñoz v. Lotería de P.R.*, **2006 J.T.S. 74**; 167 D.P.R.\_.

En el caso de autos, el Estado pudo demostrar mediante prueba satisfactoria y suficiente la culpabilidad del acusado más allá de toda duda razonable. La evidencia presentada por el Ministerio Fiscal fue abrumadora en cuanto a la forma en que ocurrieron los hechos en el presente caso. Las versiones del agente que investigó el accidente, el perito, así como el testimonio de la Sra. Casillas, tienden a demostrar que en efecto el apelante transcurría de manera descuidada e imprudentemente por la carretera en donde ocurrió el referido accidente. A estos efectos, quedó probado el hecho de que el apelante conducía a exceso de velocidad y como tal, al cortarle el paso al otro vehículo que venía transitando, perdió el control del automóvil. De los exhibits presentados por fiscalía, en específico el Exhibit número 3 y número 12 por estipulación, se puede apreciar la magnitud del accidente ocurrido. Según y como señaló el perito del Ministerio Público, tales daños no pudieron haber ocurrido si el vehículo iba transitando a una velocidad menor de cincuenta millas por hora. Además, precisa destacar que según surge del Exhibit número 12, se puede apreciar que la carretera en donde ocurrió el accidente era una curveada, por lo cual se debió haber tenido más cuidado al acelerar en la misma, con las intenciones de rebasar y cortar a otro vehículo. Así pues, y luego de un minucioso examen de la prueba presentada en el caso de autos, podemos colegir que el Estado probó la culpabilidad del acusado más allá de duda razonable.

No podemos coincidir con el apelante en que debido a que el juez de instancia tardó siete días en emitir su determinación, ello de por si sólo sea óbice de la existencia de duda razonable. Según y como mencionáramos anteriormente, duda razonable no es un duda especulativa, sino una que surge como producto del raciocinio y la insatisfacción de la conciencia del juzgador con la prueba presentada. Predicado en ello, entendemos que la tardanza o no tardanza en la determinación de un juez no es factor que determine la existencia de duda razonable. La prueba presentada por las partes merecía el detenido análisis y la evaluación del juzgador de los hechos.

En resumen y a modo de conclusión, los señalamientos del apelante carecen de mérito. El Estado logró probar su caso más allá de duda razonable. Los testimonios y la prueba presentada por las partes fue adjudicada con aquel valor probatorio que el juzgador de los hechos estimó concederles. De igual manera, fue el juez a nivel de instancia el que oyó el testimonio de los testigos, adjudicándole a éstos su respectiva credibilidad. Luego de

escuchada la prueba, el juez de instancia determinó que a base a la misma, el apelante era culpable del cargo imputado. Por lo que no existiendo prejuicio, parcialidad o error manifiesto en la determinación del Tribunal de Primera Instancia, este foro apelativo le ofrece deferencia a la determinación que el foro apelado realizó.

De acuerdo con lo anteriormente expresado, se confirma la sentencia.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria.

Mildred Ivonne Rodríguez Rivera
Secretaria Tribunal de Apelaciones Interina